**C.J. REALTY, INC., a Utah corporation, Plaintiff and Appellant,**

v.

**Gary J. WILLEY, individually and dba Village Properties, Hotel Development Corporation, a Utah corporation, Greyhound Leasing And Financial Corporation, a corporation, Western Hospitality, Inc., a corporation, 90th South Associates, Ltd., a Utah limited partnership, Grayson Development Company, a Utah partnership, and David F. Evans, trustee, and John Does I–V, inclusive, Defendants and Respondents.**

No. 860175–CA.

Court of Appeals of Utah.

July 8, 1988.

---

11. *Id.*

David K. Smith (argued), Midvale, for plaintiff and appellant.

Taylor D. Carr, Salt Lake City, for defendants and respondents.

Before BILLINGS, GARFF and ORME, JJ.

## OPINION

GARFF, Judge:

Plaintiff and appellant, C.J. Realty, Inc. (C.J. Realty), a licensed real estate broker, appeals from a summary judgment in favor of defendant and respondent, Willey dba Village Properties (Village Properties), on C.J. Realty's action for breach of contract.

At all times relevant to this action, C.J. Realty was engaged in marketing real es-

tate while Village Properties developed hotel and motel properties.

On March 22, 1982, C.J. Realty's agent, Roland Vance, met with Gary Spencer, Village Property's agent, to discuss the possibility of C.J. Realty finding buyers for Village Properties' hotel development projects. During this meeting, C.J. Realty and Village Properties entered into the agreement memorialized in the following letter:

Attention: MR. [sic] Gary Spencer

Dear Gary:

Thank you for the Motel/Hotel information you gave to me. I am now working with prospective buyers for those properties and I would like to clear these names with you:

Messrs. George Brown, Ron Young, Robert Parker, Robert Bauman, Brad Thompson, and Drs. Randle and Paull; also Collier Heinz, Inc.

The commission will be 3% of gross sale, unless otherwise negotiated, on all properties in which any of the above may purchase from or through Village Properties. Commission would be due at the closing of the property.

Accepted: Date 3/22/82

s/ Roland Vance

C.J. Realty

Accepted: Date 3/22/82

s/ Gary Spencer

Village Property

Approximately six months later, Village Properties acquired an interest in property for a hotel development project. It is undisputed that Village Properties had no interest in or intent to develop this particular property at the time it signed the agreement with C.J. Realty. Village Properties eventually sold this property, without any assistance from C.J. Realty, to one of the prospective purchasers listed in the agreement, Robert Bauman. C.J. Realty, pursuant to the agreement, demanded a three percent commission for the sale, amounting to approximately $120,000, which Village Properties refused to pay.

C.J. Realty filed an action to recover the commission. Village Properties moved for summary judgment on the ground that there was no genuine issue of material fact because the property sold was not specifically identified in the agreement and did not exist at the time the agreement was signed, with the consequence that the contract violated the Statute of Frauds, Utah Code Ann. § 25–5–4(5) (1984).

The trial court adopted Village Properties' reasoning and granted summary judgment.

The parties raise several issues on appeal, including (1) whether the agreement in question was a finder's fee agreement or a brokerage contract; (2) if found to be a brokerage contract, whether it was valid under the Statute of Frauds, Utah Code Ann. § 25–5–4(5); and (3) if valid under the Statute of Frauds, whether there was a genuine issue of material fact as to the inclusion of the subsequently acquired property in the contract.

I

■ C.J. Realty argues that the agreement in question was a finder's fee agreement rather than a real estate listing, so should not be construed under the statutes governing real estate brokers, including the Statute of Frauds.[1] On the other hand, Village Properties contends that the agreement was a brokerage contract which, to be enforceable under the Statute of Frauds, would require a written description of the property in question.

---

1. C.J. Realty, in arguing that this contract was a finder's fee agreement, stated that the contract only required C.J. Realty to supply a list of hotel-motel purchasers in return for a commission if a listed purchaser should purchase property from Village Properties. Generally, a real estate listing agreement requires that a real estate broker be the "procuring cause" in bringing about a sale of real property. *Raddatz v. Northland Dev. Co. of Minneapolis,* 352 N.W.2d 474, 478 (Minn.Ct.App.1984). However, "parties may contract for lesser performance. The terms of the contract govern. A broker is entitled to a commission when he has performed everything he undertook to perform under his agreement with the seller." *Id.* (citation omitted). This agreement may simply be to procure prospective buyers.

Utah Code Ann. § 61–2–2(1)(a) (1987) provides, in pertinent part, that the term "principal real estate broker" means:

> any person who for another and for valuable consideration, or who with the intention or in the expectation or upon the promise of receiving or collecting valuable consideration ... assists or directs in the procuring of prospects ... which does or is calculated to result in the sale ... of any real estate....

Statutory regulation of real estate transactions applies to any person coming under this description, unless exempted by Utah Code Ann. § 61–2–3 (1986). C.J. Realty has not asserted that it is exempt under this statutory provision.

The Utah Supreme Court interpreted this description in *Diversified General Corporation v. White Barn Golf Course, Inc.*, 584 P.2d 848 (Utah 1978), finding that section 61–2–2 controls not only brokerage listings but agreements purporting to be finder's contracts.[2] In *Diversified*, defendant was a corporation seeking persons willing to agree to purchase its real property. The relevant portion of the agreement which the *Diversified* court determined to be a brokerage listing subject to real estate regulation pursuant to section 61–2–2, provided that:

> plaintiff should have "the right to act as finder for purchase of the property from the corporation." The agreement recited that in consideration of the services as a finder, defendant agreed to pay plaintiff 13⅓ percent of the sales price.
>
> ....
>
> The parties agreed plaintiff was to render no other services than those specifically provided.

*Id.* at 849.

In *Diversified*, plaintiff, who was not a licensed real estate broker, argued that his finder's services should not come under the real estate licensing statutes because "he did not negotiate, but merely put the defendant in the position where he might negotiate," so the services were something less than the real estate statutory scheme contemplated. *Id.* at 850 (quoting *Corson v. Keane*, 4 N.J. 221, 72 A.2d 314, 316 (1950)). The *Diversified* court rejected this argument, indicating that the legislature, in protecting "the public from unqualified and unscrupulous people," intended to include such "finders" within the statutory scheme. The Utah court cited *Corson v. Keane*, 72 A.2d at 316, wherein the court, in defining "negotiating," stated that a real estate broker's authority is circumscribed by the terms of the agreement, and by those terms may be required to effect a sale or merely produce a customer. *Diversified*, 584 P.2d at 850. The Utah court, quoting *Corson*, then went on to state that:

> The essential feature of a broker's employment is to bring the parties together in an amicable frame of mind, with an attitude toward each other and toward the transaction in hand which permits their working out the terms of their agreement. They may reach that agreement without his aid or interference.
>
> .     .     .     .     .
>
> This does not mean that the broker has not negotiated the transaction.... If the statute does not apply to such a situation, then it is a toothless enactment. Every unlicensed broker will make the same argument that the plaintiff here has made, that he did not have to bring the parties to actual agreement upon all the details, that that phase was something for the parties themselves to

---

**2.** The Utah Supreme Court, in *Diversified General Corporation v. White Barn Golf Course, Inc.*, 584 P.2d 848 (Utah 1978), interpreted a former statute which is substantially similar to the current statute with respect to this issue. The former statute, Utah Code Ann. § 61–2–2 (1978), stated, in relevant part, that:

> [t]he term "real estate broker" within the meaning of this chapter shall include all persons, partnerships, associations and corporations, foreign and domestic, who for another and for a fee, commission or other valuable consideration, or who with the intention or in the expectation or upon the promise of receiving or collecting a fee, commission or other valuable consideration ... assists or directs in the procuring of prospects ... which does or is calculated to result in the sale, exchange, leasing or renting of any real estate....

Therefore, we find the reasoning in *Diversified* applicable to the present case.

determine. *In short, every unlicensed broker will be enabled to carry on his business just as he did before the statute came into existence, simply by calling himself a finder, an originator, an introducer, instead of a broker. This would be an absurd limitation of the statute and one unfounded in reason or policy.* A broker "negotiations" [sic] just as much when he brings parties together in such frame of mind that they can by themselves evolve a plan of procedure, as when he himself carries on the discussion and personally induces an agreement to accept a specific provision.

*Id.* (quoting *Corson v. Keane*, 72 A.2d at 316) (emphasis added).

Other jurisdictions have similarly found. For example, the Arizona Supreme Court, in *Red Carpet–Barry & Associates v. Apex Associates*, 130 Ariz. 302, 635 P.2d 1224 (1981), also found that such an agreement was not a finder's fee contract but a real estate listing agreement subject to real estate regulatory law because the service involved in the contract, the registration of potential buyers with the sellers in return for a commission if a sale was consummated, "clearly involved traditional brokerage activities." *Id.* at 1227.[3] This court stated that persons should not be able to evade real estate regulations merely "by labeling the agreement as a finder's fee contract." *Id.* *See also Phillippe v. Shapell Indus., Inc.*, 43 Cal.3d 1247, 743 P.2d 1279, 241 Cal.Rptr. 22 (1987); *Pacesetter Properties, Inc. v. Hardaway*, 635 S.W.2d 382, 391 (Tenn.Ct. App.1981).

■ In the present case, C.J. Realty is a licensed broker. Under a contract similar to those interpreted in *Diversified* and *Red Carpet–Barry*, C.J. Realty limited its duties to furnishing names of prospective purchasers to Village Properties in exchange for a three percent commission if one of the prospective purchasers bought property from Village Properties. Because such an arrangement "clearly involve[s] traditional brokerage activities," we, likewise, find that this is a brokerage agreement subject to the regulatory scheme applicable to real estate brokerage transactions, even though it is only a finder's agreement. *See Red Carpet–Barry*, 635 P.2d at 1227.

## II

■ The Statute of Frauds is part of the regulatory scheme applicable to real estate brokerage transactions. It is contained in Utah Code Ann. § 25–5–4 (1984), which states that:

> In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof, is in writing subscribed by the party to be charged therewith: (5) Every agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation.

■ The purpose of this provision is to protect property owners from fraudulent and fictitious claims for commissions. *Williams v. Singleton*, 723 P.2d 421, 424 (Utah 1986) (per curiam). It applies to the commission agreements of real estate brokers generally and not just to contracts employing brokers to "purchase or sell real estate for compensation." *See e.g., Case v. Ralph*, 56 Utah 243, 188 P. 640, 643 (1920); *cf. Woolley v. Wycoff*, 2 Utah 2d 329, 273 P.2d 181, 182 (1954) (where defendant employed plaintiff to procure a lessee rather than a purchaser of real estate, the contract did not fall within the provisions of

---

**3.** This contract was worded as follows:

RE Approx 10 acres located at the SE corner of Park & Irvington
Dear Sir:
Per our telephone conversation of today, I would like to register with you potential buyers, developed by my company Red Carpet Barry & Associates, Inc. These potential buyers are:
Steve Birdman and/or Ron Clark and any and all corporate or partnership entities they may have interest in as of 7/16/79–BR.

In the event a sale is consumated [sic] with the above parties, on the above mentioned property, you agree to pay Red Carpet Barry & Associates, Inc. a commission of $50,000. Please acknowledge your acceptance of these terms by signing the enclosed copy of this letter and return it to our office in the enclosed self addressed envelope.... *Red Carpet–Barry*, 635 P.2d at 1225–26.

section 25–5–4(5)). Thus, under this provision, a broker must allege and prove an express written contract of employment to recover a commission.

■ In the present case, the written contract concerning the finder's agreement between the parties was a sufficient "note or memorandum" of the parties' agreement to satisfy the Statute of Frauds provision of section 25–5–4(5). The contract includes the critical terms of a finder's agreement: it identifies the finder, the finder's clients, the property owner who will owe a commission to the finder if a transaction is closed with any of the finder's clients, and the commission rate. As explained in Part III, this agreement is ambiguous in one respect, namely, whether it applies to all properties sold by the owner to the finder's clients or just to certain properties.

Finding such an agreement to be a "sufficient note or memorandum" is not inconsistent with the Statute of Frauds. As one commentator has recognized:

[N]o writing or memorandum can ever be the complete and perfect witness sufficient in itself to establish the contract and its terms....

It seems clear that parole evidence is admissible to explain and apply a note or memorandum of an oral contract within the statute of frauds whenever it would be admissible for the purpose of interpreting or determining the operation of an integrated contract or a writing that purports to be the operative expression of the will of its creator. Indeed, oral evidence is admitted with considerably greater liberality in cases under the statute than in cases of integrated contracts.

2 Corbin on Contracts § 527 (1960). *See Lane v. Coe*, 262 N.C. 8, 136 S.E.2d 269, 274 (1964) (parole evidence could be introduced to amplify the description in a written contract to sell land). The California Supreme Court has summarized the view we take in this case:

the essential part of a contract to employ a real estate broker, so far as the statute of frauds is concerned, is the matter of the employment and consequently need not describe the land specifically, if the terms of the employment can be made

definite without it. The description of the land and its identity are only incidental to the main purposes of the contract, and, since contracts of that nature do not purport to involve the title or right of possession of land, much greater liberality is allowed in construing and curing defective descriptions ... for, as stated, so far as the statute of frauds is concerned, the terms of employment are the essential parts. The well-established rule is, therefore, that broker's contracts are not to be declared void merely because of a defect, uncertainty or ambiguity in the description of the property to be sold, when such defect can be cured by allegations and proof of extrinsic facts or circumstances.

*Pray v. Anthony*, 96 Cal.App. 772, 274 P. 1024, 1026 (1929). *See also Needham v. Abbot Kinney Co.*, 217 Cal. 72, 17 P.2d 109 (1932).

### III

To determine whether there is a genuine issue of material fact as to the inclusion of Village Properties' subsequently acquired property in the present contract, we must look at the property references contained in the contract. The first paragraph contains the term "those properties" described in the "Motel/Hotel information" given to C.J. Realty by Village Properties. The second contains the term "all properties ... which any of the above may purchase from or through Village Properties."

The first term, "those properties," refers to property descriptions given in an informational memo to C.J. Realty by Village Properties prior to the date of the contract. The second term, "all properties," is generally specific, covering all properties which any of the listed prospective purchasers might purchase from Village Properties. The two terms, taken together, create an ambiguity.

■ A contract is considered ambiguous if "the words used to express the meaning and intention of the parties are insufficient in a sense that the contract may be understood to reach two or more plausible meanings." *Metropolitan Property & Liab. Ins. Co. v. Finlayson*, 751 P.2d 254, 257 (Utah Ct.App.1988) (quoting *Central Sec.*

*Mut. Ins. Co. v. De Pinto*, 235 Kan. 331, 681 P.2d 15, 17 (1984)).

The contract in this case has at least two possible meanings. The first term, "those properties" described in the informational memo, clearly cannot include a description of the property at issue because the property was not in existence at the time the parties signed the contract. However, the second term, "all properties," may well have been intended to apply to Village Properties' future as well as present holdings. Roland Vance stated in his deposition that the agreement was to include "all the properties that they [Village Properties] had for sale at that time and those that were coming up in the immediate, near future." Thus, this second term could apply not only to the properties specified in the descriptive memo but also to after-acquired properties, such as the property at issue.

■ If the contract is ambiguous, "extrinsic evidence as to the parties' intent must be received and considered in an effort to glean what the parties actually agreed to." *Wilburn v. Interstate Elec.*, 748 P.2d 582, 585 (Utah Ct.App.1988); *see also Barnes v. Wood*, 750 P.2d 1226, 1229 (Utah Ct.App.1988); *Miller v. Archer*, 749 P.2d 1274, 1278 (Utah Ct.App.1988). This requires the taking of evidence and the making of factual findings.

■ Since the very essence of a finder's arrangement is locating *buyers* with whom a seller might do business, and since the seller in this case closed a transaction with a prospect disclosed by the finder, it would be extraordinary if the trial court were to conclude, absent a contractual provision expressly and unambiguously so providing, that the parties really meant to exclude certain properties from the scope of their agreement. Nonetheless, the ambiguity in the contract leaves that possibility open. That ambiguity creates a material factual issue making summary judgment inappropriate and requiring resort to extrinsic evidence by the fact finder in an effort to determine what the parties actually intended.

Summary judgment is only appropriate in cases in which "the pleadings, deposi-

tions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Utah R.Civ.P. 56(c). Consequently, we affirm a summary judgment only when it appears that "there is no genuine dispute as to any material issues of fact, or where, even according to the facts as contended by the losing party, the moving party is entitled to judgment as a matter of law." *Barber v. Farmers Ins. Exch.*, 751 P.2d 248, 251 (Utah Ct.App.1988) (quoting *Briggs v. Holcomb*, 740 P.2d 281, 283 (Utah Ct.App. 1987)). If we determine that a genuine issue of material fact exists, we will reverse the trial court's determination and remand to the trial court on that issue. *Blodgett v. Zion's First Nat'l Bank*, 752 P.2d 901, 905 (Utah Ct.App.1988).

Because there is a genuine issue of material fact as to whether the parties intended the property at issue to be included in the contract, we reverse the trial court's summary judgment and remand for further factual findings consistent with this opinion.

BILLINGS and ORME, JJ., concur.